# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued September 18, 2014　　　　Decided December 5, 2014

No. 13-1155

LOUISIANA PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARKANSAS PUBLIC SERVICE COMMISSION, ET AL.,
INTERVENORS

————

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

————

*Michael R. Fontham* argued the cause for petitioner. With him on the briefs were *Paul L. Zimmering*, *Noel J. Darce*, *Dana M. Shelton*, and *Stephen Kebel*.

*Holly E. Cafer*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*John S. Moot* argued the cause for intervenors. With him

on the brief were *Gerard A. Clark*, *John L. Shepherd, Jr.*, *Andrea Weinstein*, *Dennis Lane*, *Glen L. Ortman*, *Paul Randolph Hightower*, and *Chad James Reynolds*.

Before: ROGERS and WILKINS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

ROGERS, *Circuit Judge*: The Louisiana Public Service Commission ("LaPSC") petitions for review of an order of the Federal Energy Regulatory Commission denying refunds to certain Louisiana-based utility companies for payments they made pursuant to a cost classification later found to be "unjust and unreasonable." The Commission failed, LaPSC contends, adequately to explain its reasoning in departing from its "general policy" of ordering refunds when consumers have paid unjust and unreasonable rates. We agree. Although the Commission enjoys broad discretion in fashioning remedies, *see, e.g.*, *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 393 (D.C. Cir. 2008), it must rationally explain its decision, *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 76 (D.C. Cir. 1992) ("*Town of Concord*"). In denying LaPSC's refund request, the Commission relied on precedent it characterized as a policy to deny refunds in cost allocation cases, yet the precedent on which it relied is based largely on considerations the Commission did not find applicable. Otherwise the Commission relied on the holding company's inability to "revisit" past decisions, seemingly a universally true circumstance. Accordingly, we grant the petition and remand.

**I.**

Section 206(a) of the Federal Power Act ("FPA"), 16 U.S.C. § 824e(a), requires the Commission to reform any public utility wholesale electricity rate that it determines is "unjust,

unreasonable, unduly discriminatory or preferential."[1] *See also La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999) ("*Louisiana I*"). Originally, section 206 allowed a party seeking lower rates to obtain only prospective relief at the conclusion of a FERC rate-reform proceeding — often several years after the initial filing of the complaint. *See* S. REP. NO. 100-491, at 3 (1988). By contrast, under section 205 of the FPA, utility companies seeking to raise their rates could receive nearly immediate relief, subject to refund only where the Commission declined to approve the increase. *See* 16 U.S.C. § 824d. In 1988, Congress enacted the Regulatory Fairness Act, Pub. L. No. 100-473, which amended section 206 to authorize the Commission to order refunds for certain overpayments made during the pendency of a rate-reform proceeding.

Section 206(b), as amended, requires the Commission to set a "refund effective date," which is "no[t] later than 5 months after the filing of [the] complaint." 16 U.S.C. § 824e(b). At the conclusion of the proceeding, "the Commission may order refunds of any amounts paid" during the first 15 months following the refund effective date "in excess of those which would have been paid under the just and reasonable rate . . . which the Commission orders to be thereafter observed and in force." *Id.* An exception provides that in a rate-reform proceeding

> involving two or more electric utility companies of a *registered holding company*, refunds which might otherwise be payable under subsection (b) of [section

---

[1] Section 206(a) requires the reform of "any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or . . . any rule, regulation, practice, or contract affecting such rate, charge, or classification." 16 U.S.C. § 824e(a).

> 206] *shall not be ordered* to the extent that such refunds would result from any portion of a Commission order that (1) requires a *decrease* in system production or transmission costs to be paid by *one or more of such electric companies*; and (2) is based upon a determination that the amount of such decrease should be paid through an *increase* in the costs to be paid by *other electric utility companies of such registered holding company*[.]

16 U.S.C. § 824e(c) (emphases added). This is subject to a proviso "[t]hat refunds, in whole or in part, may be ordered by the Commission"

> if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and effective date of the Commission's order.

*Id.* § 824e(c)(2).

LaPSC's petition for review concerns the last remaining issue in litigation this court has previously addressed. *See Louisiana I*, 184 F.3d 892; *La. Pub. Serv. Comm'n v. FERC*, 482 F.3d 510 (D.C. Cir. 2007) ("*Louisiana II*"). In the State of Louisiana, electricity is supplied to consumers by, among others, three "Entergy"-branded public utility companies: Entergy Louisiana, LLC, Entergy Gulf States Louisiana, LLC, and Entergy New Orleans, Inc. These companies are owned, alongside several other Entergy operating companies in neighboring states, by a single holding company, Entergy Corporation ("Entergy"). Transactions among Entergy operating

companies are governed by a Commission-approved system agreement, which enables the operating companies "to act as a single economic unit." *Louisiana I*, 184 F.3d at 894. Under the agreement, the operating companies share electricity with each other and allocate costs among themselves with the aim of "equalizing . . . any imbalance of costs associated with the construction, ownership and operation of such facilities as are used for the mutual benefit of all the [c]ompanies." *Id.* (quoting System Agreement § 3.01). This court has explained:

> The system agreement allocates capacity (or demand) costs to each operating company in direct proportion to the power that it takes when total demand upon the Entergy system peaks each month. If, at the monthly system peak, a company takes more energy than it generates, then it is considered "short" and must make an equalizing payment to the "long" companies that have provided the excess capacity. This arrangement is mutually beneficial because companies that are long have a ready outlet for their surplus energy and are thereby compensated for carrying excess capacity, while companies that are short enjoy the benefit of a low cost and dependable way of meeting their energy requirements.

*Id.* at 894–95.

In March 1995, LaPSC filed a complaint under section 206 "alleging that, due to changed circumstances, the allocation of capacity costs [under the system agreement] had become unjust and unreasonable." *Louisiana I*, 184 F.3d at 895. In particular, it objected to the inclusion of "interruptible load" when calculating an operating company's capacity charge. *See id.* at 895–96. The Commission dismissed the complaint. *See La. Pub. Serv. Comm'n v. Entergy Serv., Inc.*, 76 F.E.R.C. ¶

61,168 (1996), *reh'g denied*, 80 F.E.R.C. ¶ 61,282 (1997). After the court remanded for further explanation, *see Louisiana I*, 184 F.3d at 900, the Commission determined that Entergy's inclusion of interruptible load in assessing capacity costs was unjust and unreasonable. *See* Opinion No. 468, 106 F.E.R.C. ¶ 61,228, at PP 60-77 (2004). Entergy was ordered to adjust its rates beginning April 1, 2004, but the Commission declined to order refunds for any overcharges incurred during the pendency of the proceeding because it could not "find, as [it] must under Section 206(c) of the FPA, that the Operating Companies that would pay refunds as a result of a reallocation of costs would be able to collect those refunds from their ratepayers." *Id.* at P 88.

LaPSC again petitioned for review, and the court again remanded the case, holding that the Commission had not adequately explained why it could not make the requisite section 206(c) finding. *See Louisiana II*, 482 F.3d at 520. On remand, the Commission eventually concluded that refunds were unwarranted. But its path to that conclusion was somewhat circuitous. *See Order Denying Rehearing*, 142 F.E.R.C. ¶ 61,211, at PP 7–13 (2013).

On remand from *Louisiana II*, the Commission ordered refunds, citing the determination by the Administrative Law Judge ("ALJ") that the non-Louisiana operating companies could, in fact, recover surcharges prospectively. *Order on Remand*, 120 F.E.R.C. ¶ 61,241 (2007) ("*First Order*") (citing *La. Pub. Serv. Comm'n v. Entergy Corp.* 96 F.E.R.C. ¶ 63,002, at 65,023-24 (2001)), *reh'g denied*, *Order Denying Rehearing*, 124 F.E.R.C. ¶ 61,275 (2008) ("*Second Order*"). In August 2010, after Entergy petitioned for review and the Commission requested a remand, it amended the refund order to provide further explanation. *See Amended Order on Remand*, 132 F.E.R.C. ¶ 61,133 (2010) ("*Third Order*"). "There is no question," the Commission acknowledged, "that the Commission

has a policy of granting full refunds to correct unjust and unreasonable rates." *Id.* at P 31. It also rejected several equitable reasons for deviating from the general policy. For one, the fact that the mis-allocation "was not undertaken in bad faith does not militate against applying the Commission's general refund policy here . . . ." *Id.* at P 32. For another, because customer usage patterns were not at issue, the Commission did "not see the passage of time as affecting the equities one way or the other." *Id.*

Upon rehearing, the Commission reversed itself. *See Order Granting Rehearing in Part and Denying Rehearing in Part* ("*Fourth Order*"), 135 F.E.R.C. ¶ 61,218 (2011). Although confirming that section 206(c) did not bar the refunds LaPSC requested, the Commission declined to order them. *Id.* at P 2. "[D]isavow[ing] the distinction" it had "attempted to draw" in the earlier orders "between the treatment of refunds in rate design and cost allocation cases," *id.* at P 23, the Commission concluded that the critical consideration was that "the Entergy system as a whole collected the proper level of revenue." *Id.* at P 24.

In denying further rehearing, the Commission explained that it had "two lines of precedent on refunds, each dealing with a different situation." *See Order Denying Rehearing* ("*Fifth Order*"), 142 F.E.R.C. ¶ 61,211 at P 54 (2013) (quoting *Black Oak Energy, L.L.C.*, 136 F.E.R.C. ¶ 61,040, at P 25 (2011), *reh'g denied*, 139 F.E.R.C. ¶ 61,111 (2012)):

> When a case involves a company over-collecting revenues to which it was not entitled, the Commission generally holds that the excess revenues should be refunded to customers. By contrast, in a case where the company collected the proper level of revenues, but it is later determined that those

> revenues should have been allocated differently, the Commission traditionally has declined to order refunds.

*Id.* This case fell into the latter category because the Entergy system had simply mis-allocated costs and did not over-recover. *See id.* at P 61. The Commission also discussed the precedent underlying its policy. In previous rate design and cost allocation decisions, it had reasoned that: "refunds would potentially result in under-recovery"; "a different [cost] allocation would have resulted in a different decision by consumers or the utility had it been instituted at the time of the facts at issue, but it is simply too late to alter the result"; there may be a "detrimental effect upon an organized market"; the surcharge resulting from refunds would fall on the current generation of ratepayers who were not the same ratepayers that received the benefits" (internal quotation marks omitted); and the "complication and cost of rerunning markets" may be unjustified. *Id.* at P 55 & n.127. Acknowledging that the first factor (the potential for under-recovery of costs) "is not present," *id.* at P 63, the Commission claimed to follow its "long-standing policy" of denying refunds in cost allocation cases, *id.* at P 57 (quoting *Occidental Chem. Corp.*, 110 F.E.R.C. ¶ 61,378, at P 10 (2005)). The Commission stated it would, however, "continue to allow for . . . discretion" in particular cases "to determine whether refunds are appropriate." *Id.* at P 51. In addition, it noted that an equitable consideration "disfavor[ed]" refunds here: "Entergy cannot review and revisit past decisions were we to order a refund." *Id.* at P 63. LaPSC petitions for review.

## II.

"[W]hen a federal court of appeals reviews an administrative agency's choice of remedies to correct a violation of a law the agency is charged with enforcing, the scope of

judicial review is particularly narrow." *La. Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 224 (D.C. Cir. 1999) (quoting *Nat'l Treasury Emps. Union v. FLRA*, 910 F.2d 964, 966–67 (D.C. Cir. 1990)). Thus, this court generally "defer[s] to [the Commission's] decisions in remedial matters, respecting that the difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 816 (D.C. Cir. 1998) (internal quotation marks omitted). The court has often noted that the breadth of the Commission's discretion is "at its zenith" when fashioning remedies. *La. Pub. Serv. Comm'n*, 174 F.3d at 225 (internal alterations and quotation marks omitted).

At the same time, "[a]s an administrative agency, [the Commission] is subject to the constraints of the Administrative Procedure Act and consequently is forbidden from acting in a way that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Koch Gateway Pipeline Co.*, 136 F.3d at 815 (quoting 5 U.S.C. § 706(2)(A)). In the present context, the Commission must "show that it considered relevant factors and struck a reasonable accommodation among them, and that its order granting or denying refunds was equitable in the circumstances of th[e] litigation." *Town of Concord*, 955 F.2d at 76 (internal quotation marks, alterations, and citations omitted). To the extent the Commission relies upon factual findings to support its exercise of discretion, its findings must be supported by substantial evidence. *See La. Pub. Serv. Comm'n*, 174 F.3d at 225.

**A.**

LaPSC contends that the denial of refunds conflicts with the core purpose of the Federal Power Act, namely, "the protection of consumers from excessive rates and charges,"

*Mun. Light Bds. of Reading & Wakefield v. Fed. Power Comm'n*, 450 F.2d 1341, 1348 (D.C. Cir. 1971). The court does assess the Commission's remedial decisions in light of the underlying aims of the FPA and will set aside a remedy that "thwart[s] the core purposes . . . of the statute." *Town of Concord*, 955 F.2d at 75; *see also id.* at 74. Yet even assuming the "primary aim" of the FPA is to "protect[] . . . consumers from excessive rates and charges," *Municipal Light Bds.*, 450 F.2d at 1348, there is no conflict with that purpose here. The FPA did not authorize refunds in section 206 proceedings until the 1988 amendments made by the Regulatory Fairness Act. Even then, Congress barred refunds in holding company cost allocation cases unless it can be shown that the utility will not suffer an under-recovery. *See* 16 U.S.C. § 824e(c). To hold that refunds are mandatory every time there is an unjust or unreasonable rate would be contrary to Congress's use of the permissive "may" in section 206(b), and to this court's rejection of the argument that the amendments create a presumption in favor of refunds, *see Town of Concord*, 955 F.2d at 76. Section 205 of the FPA declares unjust and unreasonable rates to be "unlawful," 16 U.S.C. § 824d(a), and section 206 requires the Commission to reform any such rates, *see id.* § 824e(a). Whether a party should receive refunds for past payments of excessive charges is a separate issue. *See Town of Concord*, 955 F.2d at 73

Relying on *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999), and *Public Service Co. of Colorado v. FERC*, 91 F.3d 1478, 1490 (D.C. Cir. 1996), LaPSC insists that there is "a strong equitable presumption" in support of "making parties whole" through refunds. Its reliance is misplaced. Under *Exxon*, the "presumption" urged by LaPSC applies "when the Commission [has] commit[ted] legal error." *Exxon Co., U.S.A.*, 182 F.3d at 49 (internal quotation marks omitted). LaPSC has not identified an analogous legal error; the Commission's initial dismissal of LaPSC's complaint is not what caused Entergy's

rates to become unjust and unreasonable. And *Colorado* supports refunds where producers would otherwise keep unlawful overcharges. *See Pub. Serv. Co. of Colorado*, 91 F.3d at 1490. Here, the Commission's denial was based principally on the fact that the Entergy system, as a whole, did not retain unlawful overcharges. "[A]bsent some conflict with the explicit requirements or core purposes of a statute, [the court] ha[s] refused to constrain agency discretion by imposing a presumption in favor of refunds." *Town of Concord*, 955 F.2d at 76.

LaPSC also contends that the Commission's decision to deny refunds institutes a "policy" that "impermissibly denies consumers any practical remedy for unjust and unreasonable rates" "in cases where costs are allocated among a parent's subsidiaries." Pet'r Br. 43. The Commission, however, did not announce "[t]he elimination of Section 206 as a vehicle to remedy unlawful rates," *id.* at 30, because even under the policy as described, the Commission would allow refunds where there is system over-recovery or a filed rate violation.

**B.**

LaPSC more persuasively contends that the Commission "did not reasonably explain the departure" from its "general policy" of ordering refunds when consumers have paid unjust and unreasonable rates. *Id.* at 48; *cf. Third Order*, 132 F.E.R.C. ¶ 61,133, at P 31 & n.62 (citing approval of the refund policy in *Westar Energy, Inc. v. FERC*, 568 F.3d 985, 989 (D.C. Cir. 2009)). The Commission can depart from a prior policy or line of precedent, but it must acknowledge that it is doing so and provide a reasoned explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983).

The Commission's primary explanation for denying

LaPSC's refund request was that a different "general policy" applied in which refunds are denied in both cost allocation and rate design cases. *Fifth Order*, 142 F.E.R.C. ¶ 61,211, at P 57; *see id.* at PP 49–75. The Commission stated that it saw no reason not to follow the "same approach here" because it viewed "the issues of inclusion or exclusion of interruptible load in allocating costs as a demand allocation dispute" — "a zero-sum game" for the Entergy system — "rather than a case of cost over-recovery." *Id.* at P 61. In fact, the Commission's decisions have relied on specific factors rather than such a broad policy. For instance, in cost allocation decisions where the utility over-recovered or violated the filed rate, the Commission has ordered refunds. *See, e.g.*, *Fifth Order*, 142 F.E.R.C. ¶ 61,211, at PP 65, 69, 73 (citing *Nantahala Power & Light Co.*, 19 F.E.R.C. ¶ 61,152, at 61,280 (1982) (over-recovery)); *Blue Ridge Power Agency v. Appalachian Power Co.*, 58 F.E.R.C. ¶ 61,193, at 61,603 (1992) (filed rate violation). Decisions denying refunds have generally involved the possibility of under-recovery. *See, e.g.*, *Black Oak Energy, LLC*, 136 F.E.R.C. ¶ 61,040, at P 28 (2011); *Occidental Chemical Corp.*, 110 F.E.R.C. 61,378, at P 10 (2005). The Commission's citation of *American Electric Power Service Corp.*, 114 F.E.R.C. ¶ 61,288 (2006) — where, on accepting a rate filed under FPA § 205, the Commission unsurprisingly did not award refunds with respect to the lawful rates previously in effect, *id.* at P 26 — hardly advances its explanation.

The Commission also relies on *Southern Company Services, Inc.*, 64 F.E.R.C. ¶ 61,033 (1993), in which, after finding Southern had not met its burden under FPA § 205 to show that its proposed cost classification would be just and reasonable, it denied refunds because there were no "excess revenues to the Southern System" and past "operational decisions . . . cannot be undone." *Id.* at 61,332. But one decision does not constitute a "line[] of precedent," *Fifth Order*, 142 F.E.R.C. ¶ 61,211, at PP 11, 54 (internal quotation marks omitted), much less offer a

13

comprehensive theory. The Commission has not pointed to such a theory in *Southern Company* or any other decisions. The premise of a "general policy of denial of refunds," *id.* at P 57, suggests a broader rule than the Commission's decisions establish. As Commission counsel acknowledged during oral argument, its previous decisions do not speak directly to the circumstances of this case. *See* Oral Arg. Tr. 15–16, 23–24. Consequently, the Commission's reliance on its "policy" does not suffice to explain its decision.

A further problem is that the equitable factors relied on by the Commission in previous refund denials were largely absent here. In identifying its "policy," the Commission pointed to the following reasons for denying refunds: potential under-recovery by the utility; consumers' and utilities' inability to revisit past decisions; a "detrimental effect upon an organized market"; different generations of consumers paying the surcharges and receiving the past benefits; and the "complication and cost of rerunning markets." *Fifth Order*, 142 F.E.R.C. ¶ 61,211, at P 55 & n.127. The Commission recognized that "the danger of under-recovery of costs in this case is not present." *Id.* at P 63. It made no mention of any "past decisions" by consumers, *see id.* at PP 63–64, or of inequities among different generations, or of detrimental effects on any market.

The Commission identified two considerations as warranting the denial of refunds in LaPSC's case: the lack of over-recovery by Entergy and "the fact that Entergy cannot review and revisit past decisions were [the Commission] to order a refund," *id.* at P 63. Neither consideration carries the Commission's burden of reasoned explanation or ties this case to the "long-standing policy," *id.* at P 57 (quoting *Occidental Chemical Corp.*, 110 F.E.R.C. ¶ 61,378, at P 10 (2005)). The Commission did not explain why a lack of over-recovery should automatically negate refunds. And it neither identified any

specific "past decisions" that Entergy could not revisit, nor explained why that fact — presumably true in every refund decision — was more significant here than in other decisions in which it orders refunds.

To the extent the Commission maintains that it relied on *all* the factors in its cited decisions (except under-recovery, which it had explicitly rejected), the *Fifth Order* reveals otherwise. In paragraph 55 and footnote 127, the Commission listed "equitable considerations that [it] has examined" when denying refunds in cost allocation and rate design decisions. *See Fifth Order*, 142 F.E.R.C. ¶ 61,211. Those considerations explained why the "policy" *existed*, not why it applied to *this case*. Beyond reliance by Entergy and its lack of over-recovery, the Commission did not state that any other consideration mentioned in its precedent was present here.

Although the Commission can "adher[e] to its standard approach," *Westar Energy*, 568 F.3d at 989, it cannot reasonably apply a policy that is based on factors that it acknowledges are not present in a given case. Invocation of its "policy" did not eliminate the need for the Commission to consider the factual circumstances here: As a result of an unjust and unreasonable cost allocation, consumers in Louisiana paid their utility companies too much while consumers in other states paid too little, and refunds, if ordered, would transfer a subset of the total overpayment to Entergy's Louisiana operating companies from other Entergy operating companies.

## C.

The Commission maintains that it did weigh the equities when it relied on Entergy's lack of over-recovery and inability to revisit past decisions. *See Fifth Order*, 142 F.E.R.C. ¶ 61,211, at PP 61-64. Yet its analysis fails to provide an adequate explanation for denying LaPSC's refund request. The

Commission relied on the fact that Entergy did not receive more revenue than it was entitled to receive in the aggregate, stating that "the allocation of demand-related reserve costs . . . is a zero-sum game in which the Entergy System receives no excess revenues." *Id.* at P 61. Intervenor Entergy Services, the agent for Entergy's operating companies, maintains that a lack of over-recovery or filed rate violation is the *only* factor the Commission need consider. It suggests that "where, as here, there is no tariff violation or over recovery by utility shareholders, no 'wrong' exists to be rectified with refunds." Intervenor's Br. 13. Pointing to the statement in *Town of Concord* that refunds are "akin to restitution," 955 F.2d at 75, Entergy Services concludes that the Commission need only order refunds where a utility has been unjustly enriched. This is not the rationale adopted by the Commission in denying LaPSC's refund requests, and the agency's "action cannot be upheld merely because findings *might* have been made and considerations disclosed which *would* justify" the decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (emphasis added). Entergy Services' analysis is also contrary to the Commission's apparent practice of analyzing factors beyond over-recovery. The statement in *Town of Concord* does little to advance Entergy Services' suggested approach inasmuch as that case involved a filed rate violation "of the most minor, technical sort," 955 F.2d at 75, where the charges at issue were recoverable but not through the accounting mechanism the utility had employed, *id.* at 69.

The Commission concluded that "an equitable ground disfavoring refunds" was "the fact that Entergy cannot review and revisit past decisions were we to order a refund." *Fifth Order*, 142 F.E.R.C. ¶ 61,211, at P 63. It stated that "operational decisions made while the operating companies' proposed cost classification was in effect, and thus made in reliance on that classification, cannot be undone." *Id.* (quoting *Southern Co. Services, Inc.*, 64 F.E.R.C. ¶ 61,033, at 61,332 (1992)). Yet some

amount of reliance is likely to be present every time the Commission considers ordering refunds. As long as decisions by consumers and utilities respond to price, it is possible that they would have altered their consumption or production decisions, respectively, had they been faced with different price signals. Because that is always true, "past decisions" in the abstract cannot be the *only* factor against refunds. Phrased at that level of generality, the same factor is present whenever the Commission *does* order refunds.

The Commission did not identify any particular decisions made by Entergy in reliance on the inclusion of interruptible load in its cost allocation that in some way particularly weakened the case for refunds. *See Fifth Order*, 142 F.E.R.C. ¶ 61,211, at PP 63–64. Neither did Entergy Services. *See* Intervenor's Br. 18. During oral argument, Commission counsel mentioned the decision by Entergy's subsidiaries "not to shave their peak load," which they might have done under a different cost allocation, *see* Oral Arg. Tr. 18–19, but this too is a generic possibility of reliance insufficient to distinguish other decisions in which the Commission awards refunds based on unjust and unreasonable rates. Once LaPSC filed its section 206 complaint in 1995, Entergy was on notice that interruptible load could be ordered removed from the calculation of peak load. *See Exxon Co.*, 182 F.3d at 49–50; *Pub. Serv. Co. of Colorado*, 91 F.3d at 1490. Unrebutted expert evidence of record offered by LaPSC indicated that refunds between operating companies in the context of billing errors were routine and not disruptive. *See* Affidavit of Stephen J. Baron, ¶¶ 12, 13 (Jan. 19, 2010).

Accordingly, because the line of precedent on which the Commission relied involved rationales that it concluded were not present in LaPSC's case, and because the existence of the identified equitable factor is unclear and its relevance inadequately explained, we grant the petition and remand the

matter to the Commission. It remains for the Commission on remand to consider the relevant factors and weigh them against one another, striking "a reasonable accommodation among them." *Las Cruces TV Cable v. FCC*, 645 F.2d 1041, 1047 (D.C. Cir. 1981); *see Town of Concord*, 955 F.2d at 76.